Filed 6/2/22  Abernathy v. Duncan Enterprises CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ANITA ABERNATHY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>DUNCAN ENTERPRISES,<br><br>Defendant and Respondent. | F081502<br><br>(Super. Ct. No. 18CECG04624)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Rosemary T. McGuire, Judge.

Sahagun Law and Bryan Owens Sahagun for Plaintiff and Appellant.

Sagaser, Watkins & Wieland, Paul J. Bauer and Michael J. Conway II for Defendant and Respondent.

-ooOoo-

Appellant Anita Abernathy appeals following the trial court's grant of summary judgment to respondent Duncan Enterprises (Duncan). Raised in various ways over 11 causes of action, Abernathy alleged in her complaint that she was wrongfully reassigned and terminated from her employment due to discrimination over her age and gender and in retaliation for reporting sexist behavior by a coworker.[1] The trial court rejected these assertions, concluding Duncan had submitted sufficient evidence of a legitimate business reason for its actions, uncontradicted by evidence of pretext, to warrant summary judgment. In this appeal, Abernathy contends the trial court erred in this determination. Relatedly, Abernathy contends the trial court wrongly excluded certain declaratory evidence from consideration on summary judgment and abused its discretion when it heard Duncan's motion less than 30 days before the scheduled trial. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

According to Duncan's submissions and the undisputed facts submitted to the trial court in support of its summary judgment motion, Duncan develops and produces hobby craft and ceramic art supplies, cosmetics, and various glues. As a company, between 2016 and 2017, Duncan employed more female employees than male employees and more employees over the age of 40 than under the age of 40.

In 2014, Duncan learned that consumers were buying and installing chicken coops in their backyards and decided it would attempt to offer products to those consumers. To assist with this plan, Duncan hired Abernathy, whom it learned of through a former business adviser and Abernathy's brother-in-law, Peter Heinsimer. Abernathy was initially hired in 2014 on a two-year contract, which switched to at-will employment in 2016.

---

[1] Abernathy does not challenge the judgment on the first and second causes of action, which Abernathy conceded were barred on exhaustion grounds.

2.

Based on Abernathy's work, Duncan developed and began selling low-margin chicken coops. By July 2016, Duncan was concerned about the low profitability and quality of the product that had been developed. By one count, more than 50 percent of reviewers had noted the low quality and durability of the product. And Duncan incurred repeated losses totaling around $2.5 million between 2015 and 2017. Based on these facts, Duncan claimed it decided to cease selling low-margin coops in August 2016 and switch to selling higher-margin and higher quality coops. This plan was communicated to Abernathy who was told she would not be involved in the higher-margin chicken coop development. Rather, Duncan claimed it placed three men, Dave Starr, Hawk Duncan (Hawk), and Mike Sandoval, as well as one woman, Teri Thieme, in charge of the new business efforts. Each of these individuals, save for Hawk, were over the age of 40. In addition, as part of these new efforts, Duncan sought out and contracted with Kathy Mormino, owner of The Chicken Chick, LLC, in an attempt to increase social media exposure for its chicken coops. Mormino is a woman over the age of 50.

Around August or September 2016, after being informed of this change, Abernathy and Heinsimer expressed interest in purchasing the low-margin chicken coop business from Duncan. Abernathy intended to start a new business with her brother-in-law. Abernathy worked on these plans through the end of 2016, with the initial expectation that the sale would be completed in June 2017. Abernathy also remained employed with Duncan until December 30, 2016, when her position was allegedly eliminated and she was terminated. The sale of the low-margin chicken coop business was not ultimately completed. Duncan ceased its efforts to manufacture or sell any chicken coops in October 2017.

*Abernathy Deposition and Declaration*

In support of its summary judgment motion, Duncan submitted portions of its deposition of Abernathy. The deposition showed that prior to her employment with Duncan, Abernathy had worked as director of product development at Precision Pet

3.

Products between 2005 and 2014. During that time, Abernathy introduced their chicken coop product, one of the first in the pet industry. Abernathy worked with factories to design and manufacture the product and with large retailers to offer the product to the marketplace. By all accounts, Abernathy was successful in this role. Abernathy confirmed she was hired by Duncan as product manager and licensor for the Summer Hawk Ranch division of the company, which intended to sell chicken coops.

In these excerpts, Abernathy also discussed the failure of the low-margin chicken coop product. Abernathy claimed the product was being sold too cheaply and was being affected by freight costs but alleged that when she brought up the issue with the company president, Mark Peters, he got angry and told her not to question his sales force. With respect to her reassignment and eventual termination, Abernathy confirmed she was told she would be terminated by at least October 2016 and stated that Hawk, a woman named Essence, and the "[C]hicken [C]hick" took over her role at Duncan.

With respect to her claims of gender discrimination and retaliation, Abernathy's deposition contained excerpts discussing issues Abernathy had with another employee, Greg Waples. Abernathy stated that she believed Waples did not respect her and recounted hearing him make several sexually suggestive comments about waitresses and another employee's wife and daughter during work trips. She also heard suggestive conversations between Waples and other women, one of whom was a Duncan employee. Abernathy stated she believed a culture of male dominance at Duncan caused Waples to not see her as an equal. Notably, Abernathy told her direct boss, Valerie Marderosian about her concerns with Waples and was told they would be reported to senior management, including Peters. On the issue of age discrimination, Abernathy stated she believed she was partially laid off due to age because she was told of a meeting regarding how much she was costing their health insurance.

In her opposition to Duncan's motion, Abernathy submitted a declaration which affirmed her deposition statements as submitted by Duncan. However, Abernathy did not submit any further excerpts or add any declaratory statements regarding her time at Duncan. Rather, her declaration was limited to discussing the damages she had suffered. Instead, Abernathy opposed Duncan's evidence by submitting two declarations from former Duncan employees, Fred Hammond and Marderosian.

*Fred Hammond Declaration*

Fred Hammond was a vice president of sales for Duncan between December 2012 and April 2018. Hammond reported to Marderosian until she left in March 2016. Hammond described Duncan as having "a culture of discriminating against its female employees" due to its " 'good old boys club' " executive team. He claimed women could not advance in the company and were treated differently, in that they were ignored, not taken seriously, and spoken to in condescending tones. Hammond stated the problems worsened when Larry Hermanson joined the executive team in 2015.

Hammond considered Abernathy to be the "most knowledgeable person [he had] ever met concerning chickens" but believed that she was not given proper credit for her actions at Duncan. Hammond claimed that when Abernathy was moved off chicken coop development and into sales, Hawk, a male, was given coop design duties. Hammond further stated he was ultimately promoted to a role that included both Abernathy and Marderosian's positions. There he claimed that 80 percent of the business he oversaw "remained chicken coops and agrarian products." This included time where Duncan contracted with "the Chicken Chick" to design a high-end chicken coop that never went to market.

Hammond also provided information about Duncan's insurance practices. Stating Duncan was self-insured, he stated he "sat in several executive meetings where the executive team would discuss the claims being made by employees." Hammond alleged employees who made large claims would be terminated shortly thereafter. Based on his

5.

belief that employees over the age of 40 have more health insurance claims, Hammond stated that terminating those employees would make Duncan more profitable.

Finally, Hammond declared that he had been present when Waples made sexually suggestive comments about Hammond's wife and daughter. Hammond noted Waples made sexually suggestive comments weekly, that these comments distressed both Hammond and Abernathy, and that Waples eventually resigned from his post in August 2015. Hammond stated Abernathy was retaliated against for reporting Waples's conduct, although he did not describe how he had come to this conclusion.

*Valerie Marderosian Declaration*

Valerie Marderosian had a long career with Duncan, over several stints, eventually being promoted to senior vice president and chief creative officer in 2008. This position was on the executive committee and reported to the president, Mark Peters, and owner, Larry Duncan. Marderosian was Abernathy's direct supervisor until she left Duncan on May 31, 2016.

Marderosian claimed she left Duncan because of its male-dominated culture, which discounted the value and contribution of women. Marderosian stated this became particularly acute after 2012, when Marderosian became the sole remaining woman on the executive team. Marderosian asserted that Abernathy did not receive proper credit for her work due to this company culture and that she was shifted from product development to sales so that a male, Dave Starr, could do the product design.

Marderosian confirmed that Abernathy complained about Waples's sexually driven conduct and noted other employees had complained as well. Marderosian noted that another female employee who had complained about Waples was terminated in a reduction of force shortly after her complaint. Marderosian alleged that Peters supported Waples's conduct because he believed he could do his job well. She noted that after additional complaints, some from male employees, Waples was investigated and asked to resign in August 2015.

Finally, Marderosian noted times where she had heard others refer to Abernathy as " 'an older lady' " and declared that Duncan could, at times, discriminate based on age.

*Objections to the Declarations and Court's Ruling*

Duncan filed objections to each of the declarations filed. Relevant to the issues raised in the briefing, these included 17 objections to Hammond's declaration and 20 objections to Marderosian's declaration. Duncan utilized a similar explanation for most of its objections, modifying the form slightly to raise or eliminate portions of the objection. A typical example follows:

> "Grounds for Objection 3: Objection. Legal conclusion. Lack of foundation/personal knowledge (Cal. Evid. Code §702.) Unqualified expert testimony (Cal. Evid. Code §§720, 801.) Probative value is substantially outweighed by undue prejudice, confusing the issues, or misleading the jury (Cal. Evid. Code §352.) Opinion based on improper matter (Cal. Evid. Code §803.) Marderosian provides no basis for the improper conclusion about the culture against unnamed female employees. Relevance. (Cal. Evid. Code §210). This is disparate treatment not disparate impact case. Marderosian fails to identify one female employee or one executive team member who discounted the value and contributions of females and when such occurred. Improper character evidence. (Cal. Evid. Code §§1101 *et seq*.) Marderosian seeks to utilize her subjective perception of culture to explain Duncan's actions, purportedly in accordance with that culture, as related to Plaintiff."

Duncan further argued against the declarations in its reply brief, noting among other arguments that the declarations generally lacked any discussion of specific acts which could support a claim of a culture of discrimination and thus lacked foundation for the opinions offered.

In resolving the motion for summary judgment, the trial court discussed its ruling on the declaration objections. The court led off its ruling by stating, "As explained more fully in defendant's reply brief (pages 6-9), these declarations are full of unsupported generalized conclusions and opinions lacking in foundation." The court overruled all objections to the Abernathy declaration before determining on the Hammond declaration

7.

that "objections 1 and 13 are overruled[;] objections 2-12, 14-17 are sustained" and on the Marderosian declaration that "objections 1, 2, 5 and 12 are overruled; objections 3, 4, 6-11 and 13-20 are sustained." A review of the overruled objections shows the court refused to accept objections to the full declarations and overruled objections to sections which discussed specific instances of conduct by Waples or the declarants.

*Scheduling and Hearing the Summary Judgment Motion*

As Abernathy challenges the timing of the hearing in this case, we detail the procedural aspects of this case leading up to the trial court's ruling. The trial in this case was initially set for August 3, 2020. On March 20, 2020, Duncan filed and served its motion for summary judgment, noticing a hearing date of June 3, 2020. On May 18, 2020, the trial court issued an order continuing the scheduled hearing until August 19, 2020. Two days later, the trial court entered another order, setting the hearing for July 14, 2020.

In line with this later order, Abernathy filed her opposition on June 30, 2020, and Duncan filed its reply on July 9. On July 16, 2020, the trial court issued its tentative ruling and, receiving no objections or requests for oral argument, adopted that ruling as its final order on July 21, 2020. In its tentative ruling, the court rejected an argument from Abernathy that the motion must be denied because it was "not scheduled to be heard timely because it is scheduled to be heard less than 30 days before the August 3, 2020 hearing date." The court explained, "The hearing is set for 20 days before the first day of trial. The court continued the timely-filed motion for good cause due to the COVID-19 pandemic."

*The Trial Court's Summary Judgment Order*

Having resolved that procedural dispute, and relevant to the issues raised on appeal, the trial court then reviewed the undisputed evidence in the case and concluded that Duncan had demonstrated a legitimate business justification for its actions and that Abernathy had "not submitted substantial admissible evidence of discriminatory intent in

8.

[her] discharge." Looking at Abernathy's evidence, the trial court explained the "evidence presented is speculative, overly generalized, and unsubstantiated." The court further noted undisputed evidence that after Duncan informed Abernathy of its plans to terminate her, Duncan engaged with her in an asset sale discussion and kept her employed for four months, all while Abernathy began developing a potential new business. At the same time, Duncan also contracted with another woman over the age of 40 to assist with its remaining chicken coop plans. On the issue of age discrimination, the court also noted undisputed evidence showing Abernathy cost Duncan less than the average employee on health care costs, finding that negated any age-based claim that firing her saved money. As Abernathy could not demonstrate an improper intent in her termination, she could not prevail on her discrimination or retaliation claims. The trial court thus entered judgment on Abernathy's claims.

This appeal timely followed.

## DISCUSSION

Abernathy raises her merits-based argument in this case through the lens of her core statutorily based discrimination and retaliation claims. As Duncan noted, and Abernathy does not contest, Abernathy's remaining causes of action are inextricably linked to the success of her discrimination and retaliation claims and thus rise or fall with the viability of the statutory claims. (See *McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 472 [reversal of summary judgment on statutory claim resurrects tort claim on same facts].) The majority of Abernathy's statutory claims for discrimination and retaliation are based on alleged violations of the Fair Employment and Housing Act, enacted at Government Code section 12940 et seq. Abernathy also included a related whistleblower claim under Labor Code[2] section 1102.5 that we consider separately.

---

[2] Undesignated statutory references are to the Labor Code.

9.

Upon concluding our merit review, we briefly touch on procedural issues concerning the timing of the summary judgment hearing.

### *Standard of Review and Applicable Law*

California has adopted the federal burden shifting analysis enunciated in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-805 for claims asserted under the Fair Employment and Housing Act. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*) [applying test to discrimination action]; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*) [applying test to retaliation case].) As this case is generally resolved with respect to this shared analytical structure between discrimination and retaliation claims, for simplicity this court lays out the test in the context of a discrimination action, noting the analysis remains effectively the same in the context of all but one claim in this case.[3]

"[T]he *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he [or she] sought was withdrawn and never filled." (*Guz*, *supra*, 24 Cal.4th at p. 354.) "Generally, the plaintiff must provide evidence that (1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he [or she] sought or was performing competently in the position he [or she] held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Id.* at p. 355.) While the burden is not onerous, some

---

[3] In the context of a retaliation claim, the prima facie case elements require that "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz*, *supra*, 26 Cal.4th at p. 1042.)

10.

evidence must indicate it was more likely than not that the adverse action was taken based on a discriminatory factor.  (*Ibid.*)

Satisfying this burden raises a rebuttable presumption of discrimination, meaning the employer must respond or face judgment as a matter of law.  (*Guz*, *supra*, 24 Cal.4th at p. 355.)  The employer's obligation is then to produce "admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason."  (*Id.* at pp. 355-356.)  Meeting this burden dispels the presumption and again places the burden of persuasion on the plaintiff, who then has an opportunity to demonstrate that the employer's alleged reasoning is a mere pretext for discrimination.  (*Id.* at p. 356.)

In the context of a summary judgment motion, an employer may not only argue a lack of evidence supporting a prima facie case but may also introduce competent, admissible, and facially credible evidence of a nondiscriminatory basis for its actions in line with the second step of the above analysis.  (*Guz*, *supra*, 24 Cal.4th at p. 357.)  In such a case, the plaintiff must then "rebut this facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred."  (*Ibid.*, italics omitted.)  Such evidence of pretext is more than merely showing the employer previously lied about or changed its position on its reasons for acting.  (*Id.* at p. 361.)  "[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory."  (*Ibid.*)

We review such issues, in the context of summary judgment, de novo.  (*Guz*, *supra*, 24 Cal.4th at p. 334.)

*__Abernathy Cannot Demonstrate an Issue of Fact Regarding Pretext__*

Abernathy's substantive arguments on appeal all turn on whether she can overcome summary judgment on her direct claims of discrimination or retaliation. In this case, although the parties raise issues regarding the trial court's rulings on objections to declarations submitted by Abernathy and with respect to whether Abernathy has stated a prima facie case, we need not reach these issues. This is so because Duncan has, as it did convincingly before the trial court, also presented competent evidence of a nondiscriminatory business reason for its actions and, as discussed below, the whole of the evidence submitted fails to raise a triable issue of fact that this reason was pretextual – even when considering the excluded portions of the declarations.

Duncan's asserted nondiscriminatory business reasons for its actions were the lack of profitability of Abernathy's product, a desire to attempt a different form of the product, and ultimately an acknowledgement that the product line had failed. The facially credible evidence submitted showed that the low-margin chicken coop product line was losing money and had been receiving negative reviews regularly at the time Duncan made its decisions to reassign and ultimately terminate Abernathy. Abernathy herself noted the losses in her deposition, attributing them to poor pricing decisions. In response, Duncan shifted focus to higher-margin chicken coops and brought in outside help, much the same way it initiated the product line. Again, Abernathy confirmed the use of additional outside help at her deposition. When that failed, Duncan terminated the product line.

Relying on the declarations submitted, Abernathy claims that this business justification is merely pretext for the gender and age discrimination and retaliation she suffered. In her brief, Abernathy points to Hammond's statement that 80 percent of the business he was overseeing remained in chicken coops and his statement that he sat in executive meetings where employees' insurance claims were discussed. Abernathy argues Duncan's legitimate business reasons are "easily negated" given Hammond's statement " 'it makes little-to-no-sense for DUNCAN ENTERPRISES to allege that it

12.

laid off employees from the chicken coop division because of poor profitability, and then invest 80% of its new division in chicken coops right after Ms. Abernathy was terminated, spend money on a licensing agreement with the Chicken Chick, and continue to employ several males in the role Ms. Abernathy was hired to perform.' "

As noted above, to overcome Duncan's showing of a legitimate business purpose, the evidence needs to permit a rational inference that Duncan's reasoning was pretextual. (*Guz*, *supra*, 24 Cal.4th at p. 361.) Upon review, the record evidence fails to meet this threshold requirement. Wholistically, the record barely permits any inference of discrimination, let alone pretext. Aside from Duncan's evidence regarding its losses, the product's poor reviews, and its business strategy to change the product line, the record also contains multiple facts contradicting any potential inference of discrimination or pretext. These include the fact that Abernathy and her brother-in-law were informed of the change in direction months in advance of Abernathy's termination and were offered and began negotiating an opportunity to buy out the assets of the failed product line. More directly to claims of gender bias, Duncan contracted with another woman to move forward with its higher-end offering. And relevant to Abernathy's age discrimination claim, the woman Duncan contracted with was over the age of 40. Further, the record failed to show any major claims by Abernathy relating to health insurance and, in fact, showed that she cost the company less than its average employee – an employee that was more likely than not over the age of 40.

On gender discrimination or retaliation, the declarations Abernathy submitted do little to shift this narrative. At best Marderosian's deposition indicates her belief that a discriminatory culture existed at Duncan prior to Abernathy's dismissal. But Marderosian left her employment well before Abernathy was terminated and her declaration sheds no light on the legitimacy of Duncan's facially valid business justification for its action. Hammond's declaration attempts to create a conflict, by stating that Duncan's justification makes little sense given its spending after Abernathy's

13.

dismissal. But Hammond's statements are too thin a reed to support Abernathy's entire case. His claim is circumstantial in nature, that Duncan's position makes no sense, but fails to offer any contradictory position to Duncan's claim of actual losses or Duncan's position that it first tried to offer an improved higher-margin product before terminating its chicken coop sales.

On age discrimination, the declarations are even weaker. At most, Hammond's declaration states that he heard discussions about expensive older employees' health care costs being a problem and noticed such employees were later terminated. However, his declaration, and the record as a whole, fails to demonstrate that Abernathy was one of those employees. Rather, from all available evidence, Abernathy appears to be one of the employees Duncan would retain, as her costs were substantially lower than the average employee.

" 'To avoid summary judgment, [plaintiff] "must do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses." ' " (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807.) "Circumstantial evidence of ' "pretense" must be "specific" and "substantial" in order to create a triable issue with respect to whether the employer intended to discriminate' on an improper basis." (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69.) It is not enough for plaintiff to " 'show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [Citations.] Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for the [asserted] non-discriminatory reasons." [Citations.]' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005, italics omitted.) Nothing in the record as reviewed by

14.

this court, and certainly nothing in the evidence cited and argued by Abernathy, meets even the lowest burden imposed by the case law. Accordingly, we see no error in the trial court's determination that Abernathy could not prevail on her discrimination or retaliation claims.

***Abernathy's Section 1102.5 Claim***

Throughout the history of this case, including the briefing to this court, Abernathy, Duncan, and the trial court have all analyzed Abernathy's whistleblower protection claim under section 1102.5 under the same rubric as Abernathy's Fair Employment and Housing Act claims. At oral argument appellant cited the recent California Supreme Court case of *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703 (*Lawson*), in support of a new argument that her section 1102.5 claim is subject to a different summary judgment analysis and thus should survive given the trial court's use of the *McDonnell Douglas* test.[4] Although we agree that *Lawson* rejects the *McDonnell Douglas* framework for claims arising under section 1102.5, our de novo review of the trial court's ruling does not show reversible error.

"Section 1102.5 provides whistleblower protections to employees who disclose wrongdoing to authorities. As relevant here, section 1102.5 prohibits an employer from retaliating against an employee for sharing information the employee 'has reasonable cause to believe . . . discloses a violation of state or federal statute' or of 'a local, state, or federal rule or regulation' with a government agency, with a person with authority over the employee, or with another employee who has authority to investigate or correct the violation." (*Lawson*, *supra*, 12 Cal.5th at p. 709.) Prior to and following amendments to the statutory scheme enacted in 2003, courts regularly utilized the *McDonnell Douglas* framework to resolve disputes arising under section 1102.5. (*Lawson*, at p. 711.)

---

[4] Abernathy did not provide formal notice of this new authority (Cal. Rules of Court, rule 8.254), nor did Abernathy seek to file supplemental briefing to address the altered framework (Cal. Rules of Court, rule 8.200(a)(4)).

15.

However, as our Supreme Court explained, this practice should not have continued as the 2003 amendments added a distinct framework for analyzing claims under section 1102.5. Specifically, section 1102.6 was added to state that "once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (*Ibid.*)

After an in-depth review of other statutory schemes similar in nature to that added by section 1102.6, our Supreme Court confirmed that use of the *McDonnell Douglas* framework is not well suited for such cases. As the court wrote, the "central problem lies at the third step of *McDonnell Douglas*, which requires the plaintiff to prove that an employer's proffered legitimate reason for taking an adverse action was a pretext for impermissible retaliation. [Citation.] Under section 1102.6, a plaintiff does not need to show that the employer's nonretaliatory reason was pretextual. Even if the employer had a genuine, nonretaliatory reason for its adverse action, the plaintiff still carries the burden assigned by statute if it is shown that the employer also had at least one retaliatory reason that was a contributing factor in the action." (*Lawson*, *supra*, 12 Cal.5th at pp. 715-716.)

Thus, under the proper analysis, Duncan was only entitled to summary judgment if Abernathy's evidence was insufficient to draw a reasonable inference that an activity proscribed by section 1102.5 was a contributing factor in her termination. (*Lawson*, *supra*, 12 Cal.5th at p. 709.) Notably, even under this standard an employer that is shown to have considered an impermissible factor is still entitled to summary judgment if there is no conflict in the evidence showing it would have made the same decision absent the forbidden consideration; the so-called same-decision defense. (See *id.* at pp. 717-718, citing *Texas v. Lesage* (1999) 528 U.S. 18, 20-21.)

Although Abernathy's argument suggested the mere change in analysis identified in *Lawson* was sufficient to require we reverse the grant of summary judgment to Duncan, we do not agree. Our de novo review of a summary judgment ruling independently considers the evidence submitted and seeks to determine whether judgment is appropriate as a matter of law. (*Law Offices of Dixon R. Howell v. Valley* (2005) 129 Cal.App.4th 1076, 1092.) "We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Ibid.*)

Upon an independent review of the record, this court finds no error in the grant of summary judgment. Rather, it is apparent that Abernathy's claim also fails under section 1102.6. Under section 1102.6, Abernathy was required to come forward with evidence upon which a reasonable inference can be drawn to suggest that her protected action of reporting Waples was a contributing factor in her dismissal. The evidence submitted permits no such inference.

In this case, at best, the evidence shows Abernathy reported Waples's conduct to Marderosian in either October 2014 or July 2015. According to Marderosian, this complaint was passed along to Peters, who "did not seem to be happy" about the complaint and generally "would not . . . listen to the complaint." When additional reports were made by other employees, Waples was asked to resign; which he did as of October 9, 2015. Abernathy remained employed with Duncan for more than a year after Waples resigned and potentially up to two years after her complaint was made. There is no indication in the record that Marderosian's report or Abernathy's complaint were discussed among management or otherwise considered again and no evidence indicating that whomever ultimately decided to end the chicken coop business and end Abernathy's employment was aware of or considered the report.

17.

While one can proceed through the *McDonnell Douglas* framework by merely showing the bare facts of a report, an adverse action, and some circumstance suggesting discrimination, the analysis under section 1102.6 requires, at a minimum, some valid inference that the protected action was a contributing – i.e., substantial or motivating – factor in the resulting harm. (Compare *Guz*, *supra*, 24 Cal.4th at p. 355 [*McDonnell Douglas* test] with *Lawson*, *supra*, 12 Cal.5th at pp. 714-715 [substantial or motivating factor requirement], citing *Mt. Healthy City Board of Ed. v. Doyle* (1977) 429 U.S. 274, 287.) The evidence here fails even that base requirement. Even if the evidence allowed for some inference of improper conduct in the context of the section 1102.6 analysis, our above discussion of pretext under the *McDonnell Douglas* framework demonstrates there was no evidence conflicting with Duncan's assertion it would have terminated Abernathy's employment for business reasons regardless of the issues raised in her complaint. As noted above, the record regarding the business justification for ceasing the low-margin chicken coop business, and ultimately the full line of products, was uncontradicted by Abernathy's bare claims of improper motivation. Thus, the recent Supreme Court guidance on how to analyze such whistleblower claims does not show Abernathy was entitled to proceed to trial on the evidence submitted.

### *Abernathy's Code of Civil Procedure Section 437c Argument*

Abernathy raises an additional issue regarding the timing of the summary judgment hearing in this case. Under Code of Civil Procedure section 437c, subdivision (a)(3), a summary judgment motion "shall be heard no later than 30 days before the date of trial."[5] As detailed above, in this case, the trial had been scheduled for August 3, 2020, when Duncan filed its motion. In line with the applicable rules, Duncan filed its motion on March 20, 2020, and reserved a hearing date of June 3, 2020. The court

---

[5] The motion itself must be filed at least 75 days prior to the scheduled hearing. (Code Civ. Proc., § 437c, subd. (a)(2).)

eventually rescheduled the hearing for July 14, 2020, and issued its order on July 21, 2020. Abernathy contends the trial court abused its discretion by holding the hearing on July 14, 2020, without issuing a separate order finding good cause at the time it rescheduled the June 3 hearing and by only allowing 56 days between the time it moved the hearing and the new hearing date.

Abernathy's claims are readily rejected. The record shows that Duncan timely filed its summary judgment motion, well exceeding both the 75 days before hearing requirement for filing and scheduling the hearing more than 30 days before trial. The trial court's order then moved the hearing date later in time. Thus, there can be no reasonable argument that leaving only 56 days between the time the court moved the hearing and the new hearing date violated the 75-day period used to ensure adequate time to oppose the motion. Nor can this court see any evidence of prejudice in Abernathy receiving additional time to prepare her opposition. (See *Lackner v. North* (2006) 135 Cal.App.4th 1188, 1208-1209 [noting that 75-day rule was met and no prejudice was shown where continuance ensured more than 80 days to respond].)

Similarly, we see no abuse of discretion in holding the hearing less than 30 days prior to the scheduled trial date. Because the original motion and hearing date were timely set, this case is factually different from *Robinson v. Woods* (2008) 168 Cal.App.4th 1258 and *Urshan v. Musicians' Credit Union* (2004) 120 Cal.App.4th 758. In *Woods*, the plaintiff initially scheduled the hearing less than 30 days before trial. (*Woods*, *supra*, 168 Cal.App.4th at p. 1260.) The defendant opposed on procedural grounds only and the Court of Appeal held the trial court had no discretion to unilaterally find good cause to hear the motion on an expedited schedule or to require a response in less than 75 days from the date of a properly noticed motion. (*Id.* at pp. 1261, 1268.) Similarly, in *Urshan*, the trial court erred because it unilaterally set summary judgment motions on an expedited schedule when they had not previously been timely filed. (*Urshan*, *supra*, 120 Cal.App.4th at p. 766.) In this case, Abernathy was provided

19.

adequate notice prior to the hearing and Duncan properly noticed the hearing within the statutory guidelines.  Duncan therefore did not need an initial finding of good cause, as was required in *Woods* and there is no meaningful comparison between that case and the present.  (*Woods*, *supra*, 168 Cal.App.4th at p. 1268.)

Moreover, " 'A judgment or order of the lower court is presumed correct.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, italics omitted.)  While the trial court did not identify good cause at the time it moved the scheduled hearing to a later date, it did later identify the cause as an accommodation to issues arising from the COVID-19 pandemic.  Abernathy makes no argument that this basis is invalid or constitutes an abuse of discretion and Duncan notes that a court-wide order dated April 30, 2020, had informed all litigants that all civil law and motion matters would be continued until after June 19, 2020.  Further, Abernathy makes no attempt to show the shortened time between the hearing and the scheduled trial resulted in prejudice.  (See *Robinson v. Woods*, *supra*, 168 Cal.App.4th at pp. 1267-1268 [noting one need not show prejudice only when an opposition contains only notice objection and never argues the merits].)  We thus conclude the trial court was well within its discretion to provide the parties additional time to prepare for and respond to the properly noticed summary judgment motion by setting the hearing within 30 days of the scheduled trial date.

## <u>DISPOSITION</u>

The judgment is affirmed.  Costs are awarded to Duncan Enterprises.


DETJEN, Acting P. J.

WE CONCUR:


FRANSON, J.


SNAUFFER, J.

21.